UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BARBARA ANTONELLOS, THERESA
GALLAGHER, YASMIN MAYORGA,                            16 Civ. 5793
PRINCESS MYERS, and HIDAT YASSIN,

                          Plaintiffs,                COMPLAINT

           -against-                                 PLAINTIFFS DEMAND
                                                     A TRIAL BY JURY

CENTERPLATE, INC. and FIFTH DINING, LLC,

                          Defendants.
-------------------------------------------------------------X

Plaintiffs, Barbara Antonellos ("Antonellos"), Theresa Gallagher ("Gallagher"), Yasmin

Mayorga ("Mayorga"), Princess Myers ("Myers"), and Hidat Yassin ("Yassin") (collectively,

"plaintiffs") through their attorneys, Cary Kane LLP, complain of defendants Centerplate, Inc.

and Fifth Dining, LLC (collectively, "Centerplate" or "defendants") as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action to remedy discrimination on the basis of sex in the terms

and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, Executive Law

§ 290 *et seq*. ("State Law"), and the Administrative Code of the City of New York § 8-101 *et seq*.

("City Law"), and to remedy age discrimination in the terms and conditions of employment in

violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq*.

("ADEA"), the State Law, and the City Law.

2.      Plaintiffs seek injunctive and declaratory relief, compensatory and punitive

damages, liquidated damages, and other appropriate legal and equitable relief pursuant to Title VII,

the ADEA, the State Law, and the City Law.

JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over plaintiffs' claims brought under the State and City Laws.

4.      Pursuant to § 8-502(c) of the City Law, plaintiffs served a copy of this Complaint on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York and defendants regularly do business within this District.

6.      Plaintiffs each filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in November or December 2013.  On March 10, 2016, the EEOC issued a final determination on the merits of their charges finding that there was reasonable cause to believe that plaintiffs and a class of similarly situated employees were treated differently and terminated by Centerplate because of their sex and/or age, among other protected categories, in violation of Title VII and the ADEA.  On June 27, 2016, the EEOC issued each plaintiff a notice of her right to sue Centerplate.  Plaintiffs have thus fully complied with all prerequisites of Title VII and the ADEA.

PARTIES

7.      Plaintiff Antonellos is a 65-year-old woman, born in December 1950.  She worked as a waiter in food services at the Saks Fifth Avenue flagship store on Fifth Avenue in New York, New York ("Saks"), from on or about October 18, 1999 until she was fired on July 6, 2013.

4841-2733-6242, v. 1

8.      Plaintiff Gallagher is a 55-year-old woman, born in October 1960.  She worked as a waiter at Saks from on or about June 17, 1996 until she was fired on July 6, 2013.

9.      Plaintiff Mayorga is a 37-year-old woman, born in October 1978.  She worked as a busser and waiter at Saks from on or about January 30, 2006 until she was fired on July 6, 2013.

10.     Plaintiff Myers is a 44-year-old woman, born in July 1971.  She worked as a waiter at Saks from on or about August 3, 1992 until she was fired on or about July 6, 2013.

11.     Plaintiff Yassin is a 40-year-old woman, born in December 1975.  She worked as a busser, food runner, host, and server at Saks from on or about October 15, 2007 until she was fired on July 6, 2013.

12.     Defendant Centerplate is a hospitality company that provides food services to convention centers and sports and entertainment venues.  Upon information and belief, Centerplate is a Delaware corporation with its headquarters in Connecticut, and is authorized to do business in New York.

13.     Defendant Fifth Dining, LLC ("Fifth Dining") is a subsidiary of Centerplate that, upon information and belief, was established in 2012 to operate the food and beverage services at Saks.  Upon information and belief, Fifth Dining is a Delaware corporation with its headquarters in Connecticut, and is authorized to do business in New York.

14.     Defendants each employ 15 or more employees, and are employers within the meaning of 42 U.S.C. § 2000e-(b).

## ADMINISTRATIVE HISTORY

15.     Antonellos filed a charge of sex and age discrimination against Centerplate with the EEOC on or about December 9, 2013.

16.     Gallagher filed a charge of sex and age discrimination against Centerplate with the EEOC on or about November 27, 2013.

17.     Mayorga filed a charge of sex and national origin discrimination against Centerplate with the EEOC on or about December 9, 2013.

18.     Myers filed a charge of sex, race, and age discrimination against Centerplate with the EEOC on or about December 7, 2013.

19.     Yassin filed a charge of sex, race, and age discrimination against Centerplate with the EEOC on or about December 9, 2013.

20.     On March 10, 2016, after a thorough investigation of the charges of the plaintiffs and other former Centerplate employees, the EEOC issued a final determination on the merits of plaintiffs' charges finding reasonable cause to believe that plaintiffs and a class of similarly situated employees were treated differently and terminated by Centerplate because of their sex and/or age, among other protected categories, in violation of Title VII and the ADEA.

21.     After it determined that there was reasonable cause to believe Centerplate violated Title VII and/or the ADEA, the EEOC invited the parties to engage in the process of conciliation, which ultimately failed.

22.     On June 27, 2016, the EEOC issued each plaintiff a notice of her right to sue Centerplate.

<u>FACTUAL ALLEGATIONS</u>

23.     Prior to the unlawful termination of their employment, plaintiffs worked as servers (i.e. waiters), in one or both of the restaurants located in the flagship Saks store, namely, *Café SFA* on the eighth floor, and *Snaks* on the fifth floor (collectively, the "Saks restaurants" or "restaurants").

4

24.     At all relevant times, plaintiffs were qualified to perform the duties and responsibilities of the positions they each held throughout their many years of employment in food and beverage services at Saks.

25.     Until the last nine months of plaintiffs' employment, Saks managed its own food and beverage services, including the operation of its in-store restaurants.

Centerplate Takes Over Food and Beverage Operations at Saks

26.     On August 8, 2012, Saks announced that it would be leasing its food and beverage services to Centerplate, a third party vendor.  Saks informed employees that Centerplate would take over operations on October 7, 2012, at which point their employment with Saks would terminate and they would immediately become reemployed by Centerplate.

27.     Both Saks and Centerplate management assured employees that their jobs were safe, and that they would maintain the same benefits and level of seniority they had at Saks in their continued employment with Centerplate.

28.     On August 26, 2013, Centerplate publicly announced its partnership with Saks as its official food and beverage provider, and that it would be taking over management of *Café SFA* and *Snaks* in the New York flagship store.  Centerplate also stated that it had "initiated the planning and execution of a new destination dining concept" that would launch in 2014.

29.     The new signature restaurant, *Sophie's*, inspired by Sophie Gimbel, the late designer and wife of a former Saks president, was to be the centerpiece of a multi-million dollar renovation of Saks' eighth floor restaurant *Café SFA*.  Centerplate planned to transform *Café SFA* into an "iconic New York destination" that would offer Saks' customers a "superlative dining experience as an extension of its signature retail brand."

5

30.     Saks' President and Chief Merchant Ron Frasch expressed his excitement to partner with Centerplate, a company that understood Saks' "interest in celebrating [its] legacy while incorporating fresh and innovative ideas into [its] food and beverage offerings."

31.     Michael Kaufman ("Kaufman"), President of Centerplate's Restaurant Division, stated that Centerplate was "thrilled to re-imagine the culinary offerings at Saks Fifth Avenue, one of the most guest-focused brands in the world," and was "looking forward to an ongoing partnership dedicated to upholding the tradition of quality and excellence that customers have come to expect from Saks."

32.     Centerplate officially took over management of Saks' food services on October 7, 2012.

33.     Shortly thereafter, Centerplate fired the General Manager ("GM") Steve Hyman, a man in his 60s, and replaced him with Michael Brafman ("Brafman"), a man under the age of 40.

34.     When Brafman became GM, it became clear to plaintiffs that only young, male servers fit within Centerplate's image of fine-dining at Saks and its vision of creating "dining experiences reflective of the iconic luxury retailer."

35.     Plaintiffs heard through word of mouth various comments made by Centerplate managers that reflected its bias against older, female employees.

36.     Upon information and belief, Brafman stated during a managers' meeting that Centerplate was looking for a "new, younger face" for the Saks restaurants.

37.     On multiple occasions, Cathy Green ("Green"), Centerplate's Director of Food and Beverage Services, told Myers that their servers were "not attractive enough" and were getting "too old."

6

38.     Upon information and belief, Kaufman, President of Centerplate's Restaurant Division, stated in a managers' meeting that Centerplate wanted to create a "new image" for the restaurants by hiring young, attractive, male servers.

39.     Less than a year after taking over Saks' food services, Centerplate summarily fired a group of approximately 20 employees, including a disproportionate number of highly competent, long-term female employees over the age of 40.

40.     In the months leading up to the group dismissal, an influx of young men were recruited and hired by Centerplate.

41.     Upon information and belief, Centerplate hired approximately five male servers in their 20s just two months before firing all of the female servers in both restaurants at Saks, including the plaintiffs.

42.     About a month before she was fired, Antonellos asked Centerplate GM Brafman whether she should be worried about her job given "all the young male waiters" being hired. In response, Brafman frowned at her and said, "Maybe."

<u>Centerplate's Collective Dismissal of Older, Female Employees</u>

43.     On July 6, 2013, Centerplate informed employees that the restaurants would be closing early due to a mandatory meeting. Through a series of individual meetings, Centerplate fired about 20 employees that day, or shortly thereafter, including a number of cooks, servers, bussers, and food runners.

44.     Centerplate fired seven of the approximately 15 servers employed at that time. Six of the seven servers fired were women. The eight servers retained were all men. Centerplate retained none of its female servers.

45.     Upon information and belief, the only female employee who was not fired on or about July 6, 2013 was a food runner who had a close personal relationship with Green, Director of Food and Beverage Services, and was therefore protected.

46.     Upon information and belief, 15 of the 20 employees fired on or about July 6, 2013 were over the age of 40, many of whom were in their 50s and 60s.  None of the employees fired were younger than 37 years old.

47.     Approximately half of the male waiters retained by Centerplate were in their 20s and 30s, and, upon information and belief, had far less experience than the dismissed female servers.  At least two of the younger male waiters Centerplate chose to retain over plaintiffs were recent hires with only one or two months of experience at Saks.

<u>Centerplate's Discriminatory Discharge of Plaintiffs</u>

48.     Plaintiffs were among the group of female servers summarily fired in favor of younger men.

49.     On July 6, 2013, Antonellos, Gallagher, and Yassin were fired during individual meetings with Green, Director of Food & Beverage Services, and David Winarski ("Winarski"), Director of Human Resources ("HR").   Mayorga was fired that day during a meeting with Green, Winarski, and Janine D'Esposito ("D'Esposito"), Operations Manager.   Myers, who was not working that day, was fired by Green by telephone on or about the same day.

50.     Despite their many years of exemplary service, Centerplate fired plaintiffs without warning and for no reason related to their employment or performance.

<u>Barbara Antonellos</u>

51.     Antonellos was fired after more than 13 years of outstanding performance at *Café SFA.*

8

52.     In her dismissal meeting, Antonellos asked Winarski, "Why am I being fired—because I am too old or a woman?"  Winarski stated only that Centerplate was "going in a different direction."

53.     Neither Green nor Winarski gave Antonellos any performance-related reason for Centerplate's decision to fire her.  Nor did any such reason exist, as Antonellos excelled in her position throughout her lengthy tenure.  She consistently followed orders, took virtually no time off, and maintained great relationships with her colleagues and long-time customers.  Antonellos received praise for her reliability, dedication, and for being a team player.

54.     Less than three months before she was fired, Centerplate's GM Brafman used Antonellos has an example of good customer service instructing the waitstaff to "be more engaging with their customers," like Antonellos.

### Theresa Gallagher

55.     Gallagher was fired after 17 years of exemplary service at *Café SFA*.

56.     During her dismissal meeting, Winarski told Gallagher that Centerplate was "taking the restaurant in a different direction" and no longer needed her services, noting its plans to open the upscale *Sophie's* restaurant.

57.     Neither Green nor Winarski cited any performance-based reason for Gallagher's termination.  Nor was there any performance issue to cite, as Gallagher had a well-documented history of excellent performance.  Gallagher never received any form of performance criticism or discipline over the course of her 17-year tenure.

58.     In fact, just two weeks before she was fired, Centerplate evaluated Gallagher's performance and gave her a perfect rating of 50 out of 50 points, indicating that her performance "significantly exceed[ed] target" in each of the five categories reviewed.

59.    Gallagher's supervisor wrote in her review, dated June 22, 2013, that Gallagher had "proven herself to be a valuable member of this operation," and praised her for being "cooperative" and "go[ing] above and beyond when needed." Gallagher was further praised for working "speedily and efficiently," being "[v]ery reliable," and demonstrating "good teamwork."

60.    Given her level of experience and superior performance, Gallagher was one of two servers charged with training new waiters. Indeed, in the months leading up to her termination, Gallagher trained many of the young male waiters hired to replace her and the other plaintiffs.

### Yasmin Mayorga

61.    Mayorga was fired after seven years of successfully performing multiple positions in food services at Saks, and just months after Centerplate promoted her from busser to server.

62.    During her dismissal meeting, Winarski, Green, and D'Esposito told Mayorga that they "felt bad" about letting her go, but said that Centerplate was "re-adjusting personnel."

63.    Following the meeting, another HR employee told Mayorga that he was sorry she was fired, and suggested a few places she should apply to because she was a "very good employee."

64.    At no point was Mayorga told that she was being fired for any job-related reason or past performance issue.

65.    Indeed, less than two weeks before she was fired, Centerplate evaluated Mayorga's performance and gave her a perfect rating of 50 out of 50 points, indicating that her performance "significantly exceed[ed] target" in each of the five categories reviewed.

66.    Mayorga's supervisor wrote in her performance review, dated June 25, 2013, that Mayorga had "proven herself to be a valuable member of this operation," and commended her for being cooperative, reliable, and efficient. Mayorga's supervisor also described her as "a great example of hospitality" who "display[ed] great work ethic."

10

4841-2733-6242, v. 1

<u>Princess Myers</u>

67.     After more than 20 years of exceptional service in the Saks restaurants, Myers was fired by Green over the telephone on or about July 6, 2013.

68.     During that conversation, Myers told Green that "it seem[ed] like [Centerplate] had let go of all the females." In response, Green said, "Yeah, it seems that way."

69.     Green gave Myers no performance-related reason for Centerplate's decision to fire her.  Nor was there any basis to do so, as Myers had an unblemished record of performance throughout her 20 years of employment.  Myers was never reprimanded, disciplined, or given any negative performance review at any point during her tenure.

70.     To the contrary, Myers was a highly regarded server who performed duties beyond her position, including the supervision and training of other servers.  Myers regularly supervised the *Snaks* restaurant on the fifth floor without any management present, and attended supervisor meetings when necessary.  Green repeatedly asked Myers whether she was interested in an official promotion to supervisor.

71.     Given her significant experience and exceptional performance, Myers was one of two servers responsible for training new waiters.  Indeed, in the months leading up to her termination, Myers trained many of the young male waiters hired to replace her and the other plaintiffs.

<u>Hidat Yassin</u>

72.     Yassin was fired after nearly six years of outstanding performance in a variety of positions in both *Café SFA* and *Snaks*.

11

73.     In her dismissal meeting, Winarski specifically told Yassin that Centerplate's decision to fire her was not a reflection of her or her performance, but said only that Centerplate was "going in a new direction," which included the opening of *Sophie's*.

74.     Neither Green nor Winarski cited any performance-related reason for Centerplate's decision to fire Yassin.  Nor was there any basis to do so, as Yassin had performed beyond expectations throughout her tenure.

75.     In fact, less than two weeks before she was fired, Centerplate evaluated Yassin's performance and gave her a perfect rating of 50 out of 50 points, indicating that her performance "significantly exceed[ed] target" in each of the five categories reviewed.

76.     In her performance review, dated June 22, 2013, Yassin's supervisor wrote that Yassin was "a pleasure to work with every day," and praised her for being a "team player" and "[v]ery responsive to guests and coworkers."

<u>Centerplate's Preferential Treatment of Younger Men</u>

77.     Despite their exemplary level of service and experience, Centerplate fired plaintiffs in favor of less experienced and/or less qualified men.

78.     Upon information and belief, two of the male waiters retained by Centerplate on July 6, 2013 had received poor performance reviews less than a month earlier, and had only two or three years of experience at Saks.

79.     Centerplate also retained the group of about five male waiters in their 20s who were hired less than two months before the female waiters were fired, and who were trained by two of the plaintiffs.

80.     Other older and/or female employees fired in the group dismissal were also replaced by less experienced, younger employees.  For example, a 43-year-old supervisor with 15 years of

experience was fired and replaced by a 22-year-old employee who had only one month of experience at Saks. Similarly, a 19-year-old busser was hired just two weeks before two older, veteran bussers were fired, one of whom had worked at Saks for over 22 years.

81.     Upon information and belief, two other female servers over the age of 40, who had between 14 and 20 years of service at Saks, were also fired or forced to resign within months of Centerplate taking over operations. They were subsequently replaced by younger, less-experienced men.

82.     Prior to their discriminatory terminations, Centerplate also treated older, female servers less favorably than the younger men. For example:

    a.  Centerplate GM Brafman's attitude toward the female servers was outwardly hostile and aggressive, and he regularly spoke to the women in a derogatory or offensive tone. By contrast, Brafman interacted with male servers in a friendly manner, regularly teasing and joking around with them.

    b.  Brafman subjected the work of the older, female servers to heightened scrutiny and unwarranted criticism, while overlooking comparable mistakes of the younger men. One older female server was unfairly written up for being a "burden to her colleagues" when it was customary for servers to assist each other during busy times.

    c.  Certain male servers who were chronically late and/or absent were not reprimanded or disciplined in the same way as female servers, who were reprimanded, sent home, and even fired for their absences or late arrivals.

    d.  Male servers were assigned to the preferred restaurant sections, even after arriving late for their shift. On one such occasion, Brafman assigned the busiest, most

4841-2733-6242, v. 1

lucrative section of *Café SFA* to a new male waiter who arrived over an hour late for his shift, instead of sending him home as was the standard practice. When he was unable to handle all of his tables, the assistant manager and the host both helped him cover his section, while female servers waited idly for customers to be seated in their sections.

e. Upon information and belief, Green stated in a meeting that, "if it was up to [her]," two of the male waiters "would always get preferential seating and stations."

f. Brafman allowed a new male waiter to take a vacation before accruing any vacation time, while denying the vacations requests of older, female employees who had accrued vacation time.

83. Although Centerplate told plaintiffs they were fired because of the new direction it was taking by replacing *Café SFA* with *Sophie's* in 2014, that plan never came to fruition. Upon information and belief, Centerplate never opened *Sophie's* or any other new restaurant in the Saks flagship store.

84. Indeed, on October 6, 2015, Saks announced a different "reinvention" plan in collaboration with a new partner that involved the transformation of *Café SFA* into the Parisian restaurant L'Avenue, as part of a three-year renovation of the flagship store to be completed in 2018.

85. The discriminatory treatment and discharge of plaintiffs was part of Centerplate's general pattern and practice of discrimination against older and/or female employees.

4841-2733-6242, v. 1

FIRST CAUSE OF ACTION

(Title VII- Gender Discrimination)

86.     Plaintiffs repeat and re-allege paragraphs 1 through 85 of this Complaint.

87.     By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their gender in violation of Title VII.

88.     Defendants acted with malice and/or reckless indifference to plaintiffs' statutorily protected rights.

89.     As a result of defendants' discriminatory acts, plaintiffs have suffered, are now suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

SECOND CAUSE OF ACTION

(ADEA- Age Discrimination)

90.     Plaintiffs repeat and re-allege paragraphs 1 through 89 of this Complaint.

91.     By the acts and practices described above, defendants discriminated against plaintiffs Antonellos, Gallagher, and Myers in the terms and conditions of their employment on the basis of their age in violation of the ADEA.

92.     Defendants knew that their actions constituted unlawful discrimination on the basis of age and/or showed reckless disregard for plaintiffs' statutorily protected rights. These violations were willful within the meaning of the ADEA.

93.     As a result of defendants' discriminatory acts, plaintiffs have suffered, are now suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish,

4841-2733-6242, v. 1

emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### (State Law- Gender and Age Discrimination)

94.    Plaintiffs repeat and re-allege paragraphs 1 through 93 of this Complaint.

95.    By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their gender and age in violation of the State Law.

96.    As a result of defendants' discriminatory acts, plaintiffs have suffered, are now suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### (City Law- Gender and Age Discrimination)

97.    Plaintiffs repeat and re-allege paragraphs 1 through 96 of this Complaint.

98.    By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their gender and age in violation of the City Law.

99.    As a result of defendants' discriminatory acts, plaintiffs have suffered, are now suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

4841-2733-6242, v. 1

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter a judgment:

(a)     Declaring that the acts and practices complained of herein violate plaintiffs' rights under Title VII, the ADEA, the State Law, and the City Law;

(b)     Preliminarily and permanently enjoining and restraining these violations of Title VII, the ADEA, the State Law, and the City Law;

(c)     Directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiffs' employment opportunities;

(d)     Directing defendants to place plaintiffs in the position they would have occupied but for defendants' discriminatory conduct, and make them whole for all earnings and benefits they would have received but for defendants' conduct, including without limitation, wages, tips, pension benefits, health care benefits, paid time off, and any other lost benefits;

(e)     Directing defendants to pay plaintiffs an additional amount as liquidated damages for their willful violation of the ADEA;

(f)     Directing defendants to pay plaintiffs compensatory damages for plaintiffs' mental anguish, emotional distress, and humiliation;

(g)     Directing defendants to pay plaintiffs punitive damages for their intentional disregard and/or reckless indifference to plaintiffs' statutory rights;

(h)     Directing defendants to pay reasonable attorneys' fees and costs;

(i)     Directing defendants to compensate plaintiffs for any adverse tax consequences;

(j)     Directing defendants to pay prejudgment interest; and

(k)     Granting such other and further relief as this Court may deem necessary and proper.

4841-2733-6242, v. 1

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
      July 20, 2016

                         CARY KANE LLP

By: _____
                         Tara Jensen
                         Melissa Chan
                         Attorneys for Plaintiffs
                         1350 Broadway, Suite 1400
                         New York, New York 10018
                         (212) 868-6300

4841-2733-6242, v. 1